Good morning, your honors. May it please the court, Tim Scott for the appellant, Mr. Salguero. The first issue I'd like to address is the right to be present during all proceedings and whether the jury selection process in this case violated that right, both statutorily and constitutionally. Now, the case United States v. Reyes held that on the facts of that case, one substantive conference with a prospective juror about the juror's fitness to serve outside the presence of the defendant did constitute a Rule 43 statutory violation, although on the facts of that case did not give rise to a constitutional violation. Using the framework that Reyes presents, our argument is that the facts of our case go beyond that factual matrix and do establish both a Rule 43 and a Sixth Amendment and Fifth Amendment constitutional violation. The facts that in our view are distinguishable is that in Reyes, as I said, there was one brief conference outside the presence of the defendant. And the court reasoned and held, I believe, that there's no reason to think that that one brief conference couldn't have been shared with the defendant, between attorney and defendant, once the attorney was able to confer with the defendant. Is it your position that you have to show prejudice? Our argument is that it would be a cumulative showing of prejudice. Is it structural error? We're saying cumulatively it's structural error. Now, I would be the first to concede that because of the nature of this violation, I can't stand here and say that a hypothetical different juror would have voted differently. And I don't think any criminal defendant would be able to make that showing if that is, in fact, the rule. I mean, it would just be an exercise in speculation to say what some person who didn't make it on the jury would have thought of the evidence. I don't think I've ever heard of cumulative structural error. It's a creative statement. I'm not exactly sure what it means because it's obvious in Reyes if we're thinking about the constitutional violation that it's not structural. It doesn't appear to be structural error. It appears that you have some obligation to show some kind of prejudice. Yeah, and I didn't mean to get cute in terms of coining a new phrase. I guess what I mean to say is that the substantial rights of the defendant were, in fact, violated. And what I'm saying is that that's a little bit different than showing a specific evidentiary prejudice or being able to demonstrate definitively that the conviction would have come out differently or the jury verdict would have come out differently. I guess what I'm saying is that it does undermine the basic framework of the proceedings, that it did frustrate his ability to participate in the fairness, and that that is a little bit different kind of prejudice but is a prejudice that's recognized under the law. But in this case, isn't this process that the district court used in order to go through the jury selection was one that was agreed to by the parties, was it not? Well, I think it was characterized in the government's brief as something that the defense either advocated for or specifically agreed to. I think if we look at the record, the court said we're going to do it at sidebar, and the defendants admittedly did not object to that and did make a comment that if there are people who make it into the box who have had complaints on the jury form, then I'm going to want to question them at sidebar as well. But it's not the same thing as saying that the defendant advocated for the sidebar procedure. But there's never an objection to the process? That's true. Well, I would say that's true as far as it goes when we're talking about the overall process. And then I guess the question becomes, is that tantamount to a knowing and voluntary waiver by the defendant himself? Why wouldn't it be? Well, because a knowing and intelligent and voluntary waiver requires much more than acquiescence. It can't simply be that not just the defense attorney but also the defendant sits silently while a violation of constitutional rights occur. There needs to be an explicit advisal of what the right is, what you're giving up. I mean, I think that's more consistent with our traditional notions of completely waiving something. Now, if it's plain error, you know, that's a different matter, and I'm prepared to try to argue why we think we could meet that under the circumstances. So, counsel, I want you to be precise now. So you've argued Rule 43, which is the statutory right to be present. Yes, sir. You've also mentioned the Fifth Amendment, which appears to be a due process right to be present. Yes. Sixth Amendment seems to go to public trial. Yes. Which wouldn't be the defendant's alone. He certainly has standing to raise it, but it's not his right alone. It could also be raised presumably by the public. It looks to me like the Sixth Amendment error is one that we have the courts have said is structural error. So it changes the burden that may be on you, but it's also a little hard to see that the court hasn't said that it may not be structural. So is it structural? Is it not structural? And if so, what happens here? For the Sixth Amendment, certainly it is structural. If this court were to hold that by conducting not just substantive ordeer, but also the preemptory strike process, and then also declining a request to finalize the jury. So is this the equivalent of closing the courtroom? We would say it is, yes. In what way is it closing the courtroom? In the sense that the sidebar, by definition, is cloistered or sheltered from the people who are watching it. In this case, from the defendant as well, and from the public. Now, granted, there is a transcript, but there was also a transcript in the lead Supreme Court case, the Pressy case, where someone was excluded physically. So it's the physical and out-of-earshot exclusion from these portions of the trial that we would argue do amount to a public closure. Now, where I was going to argue this departs from Reyes is that Reyes was the one instance outside of the earshot of the defendant, and enough time, presumably, for the attorney to share that information with the defendant. Here, we had at least four such substantive conversations with jurors about their ability and their fitness to serve, their ability to be fair. That spans a total of 16 pages of transcript, each of those conversations. And I think it sort of stretches belief to suggest that those 16 pages of transcript could have been sort of downloaded and presented to the defendant in the brief conferences that they did have. Where I think it came to a head, though, is where at the end of the process, when at first the defense attorney, which is, I think, an important distinction on these facts, did pass. But then confusion ensued in terms of what was the actual jury panel. And it was crystal clear that it was not crystal clear to anyone what was going on at that moment of the trial. The jury clerk started to read names and quite plainly read a name, and I believe this is at ER 537, that nobody had stricken. And so then the court said, wait, wait, wait, and there was some kind of crosstalk in terms of who was stricken. So it was pretty plain that in terms of both the government, the defense, and the clerk of the court, there was disagreement about who composed that jury. It didn't seem to me that that statement that you just made is necessarily true. I just think that what happened was the clerk made an error. Everybody seemed to agree that, no, that individual whose name you just read was not one of the ones who was stricken. But there wasn't any disagreement over anyone else, was there? Well, then the defense attorney said, well, now we need more. We need more people. Well, I think she was saying, wait a minute, I've struck seven people. You've read four names or something like that. But then that confusion got dispelled. Okay. So, I mean, I think your counterpart at the trial court level didn't suggest that she was the best and most meticulous note taker, perhaps. And there could have been some confusion on her part.  I mean, she should have been more on top of it in terms of figuring out, okay, well, these people aren't in the box. But I know that these jurors are up next. And, I don't know, I didn't see any problem there. Well, let's assume that that's true. For the sake of argument, let's assume that the trial attorney was challenged or perhaps wasn't the best note taker. That strikes me as a prototypical example of why it is important for the defendant in that case to be able to participate. And I would argue that's what elevates it to the level of a constitutional issue. Now, I'm mindful. You're talking about during the sidebars to question the individual jurors? During the questioning of individual jurors and then during the selection process itself. But the lawyer was allowed to confer with him before each strike. She conferred sometimes but not always. But I do think it comes. Okay. I do think that ultimately when she makes a very explicit request, can we look at who's in the box and then consult with the client before finalizing it? I think that's what sort of pushes it over the goal line in terms of a constitutional violation. But at that point, the jury was already figured out. At that point, the judge said, this is our panel. We're done. No further challenges. Everybody agreed. She walked back and then asked the question, can we look at the panel? And the judge said, it's not necessary. The jury is set. Yeah. Well, one of the factors in Reyes and the other cases that saved sidebar procedures from constitutional violation is the fact that the strikes were called out in open court and then finalized in front of the defendant in open court. And I think that is a distinguishing factor because when she explicitly asked to do that, she was robust. And I guess the question in my mind is, what's the harm? Let's assume that the court could have been irritated and said, well, you should have said that earlier. But, okay, fine. You can do that. Let's say that she makes another strike. Then it goes back to the government to make their other strike. And so that's why, in our view, it does rise to the level of sort of a use it and lose it, use it or lose it approach. Just because she said the magic words pass before finalizing with her client and then not having the opportunity, even though she asked to finalize it with her client, the fact that those things didn't occur, I think, does both violate the Yepes and Turner case in terms of losing strikes as well as what saved this kind of procedure from constitutional violation previously. I see I've got about three-some minutes. Go ahead. I just asked you a very specific factual question. You didn't start with the language difficulties that some other prospective jurors had. But I had just one question about juror number seven, who seemed to be the most challenged. Yes. Do you agree that that juror was, in fact, never seated? My understanding was that juror seven was seated. Okay. Well, I don't think that's true. But I'll ask the government. All right. I'll have to go back and double-check that. My understanding was that the four that we raised were each ones that were seated. If I'm wrong, I'm wrong, but I will double-check that. No, no. That's why I want to ask both of you. I think you are wrong, but I'll ask the government as well. Okay. It wouldn't be the first time, although I will double-check and make sure that I'm clear on that. Mr. Scott, I have a question. Yes, Your Honor. So I just want to make sure, going back to the right to the public trial. Now, has this been preserved? Did you lodge an objection to the court on this one? Did the trial attorney? Yeah. Not explicitly. Are you here on plain error? I would say no, because she did ask to consult with the client, and because the government advised the district court we don't need to do this at sidebar. Those are the two things I can point to to argue that the court was on notice. But the trial counsel at some point did say my client's being denied a public trial. That's true. That's true. So you can't close the courtroom. That's right. Or sidebar closes the courtroom. Okay. So if you were here on plain error, what do we do with the Weaver case? That's the Supreme Court's 2017 case. It was up on ineffective assistance of counsel. And even though the court said, yeah, it's structural error if you object, but we're not going to let you play the structural error game if you're up here on a Strickland claim. If you're here on plain error, that seems to fall someplace between structural error and we're not going to let you do that on ineffective assistance of counsel. What do we do with it? Right. Well, the first thing I would do is to argue that it's not plain error for the two reasons that I just described. What's the next best theory? The next best theory is that Weaver says what it says. Okay. All right. Thank you. I'll make sure that you have sufficient time for rebuttal. Very good. Thank you, Your Honor. Ms. Milstein. Ms. Milstein. Good morning, and may it please the Court. Sarah Milstein for the United States. In this appeal, the defendant asks to overturn the jury's verdicts because of perceived procedural problems and phantom constitutional violations. But what actually happened at trial, as is plain for the court to read from the record, shows why this court doesn't need to overturn the jury's verdicts or second-guess the district court's discretion, which the court used wisely. And the defendant effectively concedes as much, because the defendant has never claimed that the composition of the jury was improper or caused him any specific harm or led to any particular bad result. And perhaps most problematic and fatal to the defendant's appeal is that the defendant never asserts that he would have done anything differently if he were to go back in time and change anything, with the benefit of hindsight. And so the defendant makes five arguments on appeal, and they generally fall into three categories. First, the defendant finds fault with the court's voir dire process, in which no plain error actually occurred. The defendant finds fault in the court's decision not to excuse one juror for cause after doing a colloquy with that juror, and making clear that the defense had the ability to strike that juror with any number of the peremptory challenges that the defense had remaining. And lastly, the defendant complains about a double jeopardy challenge that is actually foreclosed by Supreme Court precedent in Shales. And so here, where there has been no true injury, beyond sort of the academic or theoretical, it would be the reversal of the defendant's convictions, not the failure of the court to notice them, despite defendant's silence. That would seriously affect the fairness, integrity, and public reputation of judicial proceedings in this district and elsewhere. Do you happen to know whether Juror 7 was ultimately seated? Your Honor, Juror 7 was not seated. I think what my esteemed adversary is referring to is that a juror was replaced in the number 7 seat. Right. But, I mean, Juror 7's colloquy with the court is troubling. That person did not have a real strong command of the English language, and had there been a challenge to her and she had been allowed to serve, I would have had some serious misgivings about affirming. But that juror, I can't remember her name, but the one who was originally named Juror 7, that person never actually did serve on the jury. Is that your understanding? That's correct, Your Honor. And why is that? Your Honor, I would be happy to look at the record right now, if the court would permit me. But I'd also – You said it with such confidence, I assumed you must have figured this out. That's one of the folks that your opponent challenged in the brief. Your brief didn't say that that person never, in fact, served. It looked to us as though, at the end of the day, for whatever reason she just was not back for Day 2, and therefore some other juror was seated in seat number 7. So, again, it would give me a lot of comfort if I knew that that juror, who, as I said, had some serious language difficulties, it seemed to me, actually never was allowed to serve. And you just said you were confident that she didn't, and I'm just asking, why are you so confident? Well, the reason I'm so confident is because I had this specific memory of what is in the book next to me, to my left, that a juror by the initials A.M. was seated in seat 7, and that is not the same initials of the juror who the court expressed language difficulties about. Correct. So what happened to the original juror? Did she just not come back, or was she struck, not on the record? Because the record we have never says she was struck. I understand, Your Honor. The truth is I don't have that information coming to mind. I'd be happy to submit something differently. But I will say, Your Honor, that despite, you know, big protestations by my esteemed adversary on appeal, neither party nor the court who was actually at that trial stated any specific objections to juror number 7 or any juror except for juror 21. And so, effectively, you know, it's rather easy to divine from a cold record, you know, issues that were not actually perceived by the court or either counsel when they were physically perceiving that juror and able to understand his or her, you know, cadence, difficulty or not difficulty in selecting English words. And so, you know, the cold record itself doesn't necessarily reveal what was present and perceivable by the people who were there. And this court and the Supreme Court's precedent has sort of given great deference to the perceptions of the folks who were there, which in this case was the trial court and the lawyers. And the defense counsel, of course, didn't object to that juror specifically on language grounds. It is clear from the way the defense used his preemptory strikes that the primary issue was the sensitive topic of child pornography that was the focus of this trial, the fairness of the jury and their ability to decide defendants, the defendant's guilt or not guilt based on their record before it, not any language issues. And so I think what is here, you know, the defense raised sort of for the first time just a few moments ago, the notion of this sort of cumulative structural error, which as the court pointed out is kind of a foreign topic to me as well as the court. Structural error in the Supreme Court and in this circuit is reserved for the most egregious cases, right? But a Sixth Amendment violation, that is the denial of a public trial is one of the grounds on which we have said that structural error. Yes, Your Honor. Okay, so why don't you tell us why this was not, why this didn't run afoul of the Sixth Amendment. Certainly, Your Honor. And if you want to get to the Weaver question as to whether it really is  Yes, Your Honor. So I think in a doctrinal sense, absolutely, a courtroom closure does pose Sixth Amendment questions. Here, the courtroom wasn't closed. We have, you know, case law in this circuit and elsewhere indicating that sidebar of Wadir doesn't violate a party's constitutional rights, and none of the trial Well, it doesn't violate their, what, Fifth Amendment rights to be present, which is different from violating a Sixth Amendment right for a public trial. Certainly, Your Honor. The fact that the sidebar Wadir occurred in defendant's presence under the Santos case, which this court decided in 2012, shows that the defendant, because the defendant was able to perceive those sidebar Wadir conferences, he waived his right to be present at those sidebar conferences, because this is unlike when the defendant was able to That's his Fifth Amendment right. How does he waive his Sixth Amendment right to a public trial? Yes, Your Honor. So the defendant simply asserts that the sidebars took place outside of the presence of the public, but not outside of his presence. His counsel was present. He was able to confer with his counsel each time. And so as a factual matter, he wasn't deprived of the ability of participating. Instead, had he been present, his presence would have been sort of but a shadow, as the Supreme Court has said. There's no indication that he, you know, attempted to participate, that he would have given meaningful participation had he been present. And the courtroom was simply never closed. The public was able to come in and come out, and brief discussions about legal matters at sidebar don't constitute a closure of the courtroom. I mean, if they were discussions over the federal rules of evidence, that might be different. But when you're interviewing jurors, that has a very different feel to it. I understand, Your Honor. But I think the fact that the defendant has never raised this, never raised it at trial, never raised it in the years intervening. So that gets us to the second problem, which is, is this structural error or isn't it structural error after Weaver? And this case feels like it falls between Presley and Weaver. Yes, Your Honor. You know, I'd be happy to submit something in writing in the next few days if the court would prefer me to, you know, the government to officially opine on Weaver and Presley. But I think at this time, this case simply does not rise to the level of a constitutional violation, a Sixth Amendment violation, because the courtroom wasn't closed. It was open to the public. Defendant was present for that. The public was able to perceive the panel, perceive the jurors, perceive the judge, and that simply does not a closure make. And unless any other member of the panel has questions for me, I'll thank the court for its time and be seated. Thank you, Ms. Milstein. Thank you. Mr. Scott? Your Honor, I'm also prepared to submit unless there's additional questions. Okay. Thank you both. Thank you both for your argument, very articulate, and we appreciate the assistance. The case is submitted.
judges: Bybee, Watford, Hernandez